# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### MAY SESSION, 1998

**FILED**

December 22, 1998

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | C.C.A. NO. 01C01-9601-CC-00512 |
| | ) | |
| Appellee, | ) | |
| | ) | |
| | ) | **ROBERTSON COUNTY** |
| **VS.** | ) | |
| | ) | **HON. ROBERT W. WEDEMEYER** |
| **FREDDIE MORROW and** | ) | **JUDGE** |
| **DAMIEN DARDEN,** | ) | |
| Appellants. | ) | **(Direct Appeal-Felony Murder-Civil** |
| | ) | **Rights Intimidation)** |

FOR THE APPELLANT:

COLLIER W. GOODLETT
Assistant Public Defender
109 S. Second Street
Clarksville, TN 37040

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General and Reporter

DARYL J. BRAND
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243-0493

JOHN CARNEY
District Attorney General

ARTHUR BIEBER
Assistant District Attorney
500 South Main
Springfield, TN 37172

OPINION FILED _____

AFFIRMED

JERRY L. SMITH, JUDGE

# OPINION

The appellants, Frederick D. Morrow and Damien Darden, were convicted after a Robertson County bench trial of one (1) count of felony murder, one (1) count of attempted aggravated kidnapping and one (1) count of civil rights intimidation. Both appellants were sentenced to life imprisonment for first degree murder. Morrow was sentenced as a Range I offender to consecutive terms of four (4) years for civil rights intimidation and five (5) years for attempted aggravated kidnapping.[1] Darden received Range I sentences of three (3) years for civil rights intimidation and four (4) years for attempted aggravated kidnapping, to run concurrently with each other but consecutively to the life sentence for first degree murder. On appeal, appellants raise the following joint issues for our review:

> (1) whether the trial court erred in denying appellants' motion to dismiss Counts One, Three and Four of the indictment;
>
> (2) whether they were denied their constitutional rights to due process and equal protection by the abolition of an acceptance hearing pursuant to Tenn. Code Ann. § 37-1-159;
>
> (3) whether the evidence is sufficient to support the findings of guilt beyond a reasonable doubt; and
>
> (4) whether the trial court erred in imposing consecutive sentences.

Appellant Morrow further claims that the trial court erred in (1) failing to dismiss the indictment on the basis that the grand jury selection process under Tenn. Code Ann. § 22-1-102 violates the Americans with Disabilities Act and the

---

[1] The judgments of conviction indicate that Morrow's sentences for attempted aggravated kidnapping and civil rights intimidation are to run concurrently with one another but consecutively to the life sentence for first degree murder. However, a review of the sentencing hearing transcript reveals that the trial court intended for all three (3) sentences to run consecutively to one another. When there is a conflict between the transcript and the judgment, the transcript controls. State v. Moore, 814 S.W.2d 381, 383 (Tenn. Crim. App. 1991).

Rehabilitation Act of 1973; (2) imposing excessive sentences; and (3) failing to allow Morrow to serve his civil rights intimidation and attempted aggravated kidnapping sentences on probation. Appellant Darden raises the additional issue of whether the trial judge erred in failing to recuse himself as a result of *ex parte* communications with the Assistant District Attorney. After a thorough review of the record before this Court, we find no reversible error and affirm the judgment of the trial court.

**FACTS**

On January 14, 1995, Michael and Hannah Westerman were traveling from their home in Kentucky to Springfield, Tennessee, to do some shopping and have dinner. From the back of the Westermans' Chevrolet pick-up truck flew a Confederate battle flag, which was attached to a pole mounted on the truck's tool box. On their way to Springfield, the Westermans stopped at Janie's Market in Guthrie, Kentucky, to get some gas. Mr. Westerman paid for the gas, and while he and Mrs. Westerman sat in the truck talking, Mrs. Westerman noticed a black man in a dark blue car pointing at them.

Mr. Westerman pulled the truck onto the road, and as they crossed into Tennessee, Mrs. Westerman noticed two (2) cars, one light blue and the other dark blue, following them. Mr. Westerman passed a car in front of them, and both blue cars were able to catch up with the Westermans. Although the Westermans' truck was traveling at approximately 85 miles per hour, the light blue car began to pass them on the left. Mr. Westerman pushed Mrs. Westerman on the floorboard of the truck as the car passed them. After the car

passed, Mrs. Westerman sat up in her seat, and Mr. Westerman told her that he had been shot.

Mrs. Westerman climbed over to the driver's side so that she could drive the truck. Suddenly, the light blue car came to a complete stop in the middle of the road in front of the Westermans' truck, and Mrs. Westerman saw a black man sitting in the car pointing a gun at the truck. The dark blue car which had been following the Westermans completely stopped behind the Westerman vehicle, and Mrs. Westerman was forced to drive through a ditch, across an embankment and into a parking lot in an attempt to flee the scene. However, because the two cars had blocked her access to the paved driveways into the parking lot, Mrs. Westerman had to cross another ditch in order to exit the parking lot. Mrs. Westerman then proceeded in the opposite direction, towards Guthrie, in an effort to seek medical attention for her husband and avoid further confrontation with the individuals in the blue cars.

Mr. Westerman died the next day at Vanderbilt Hospital as a result of a gunshot wound to the heart.

Shortly after the incident, the police developed appellant Darden as a suspect in the shooting. While law enforcement authorities were conducting an interview with Darden concerning the incident, appellant Morrow appeared at the police station and confessed to the shooting. In his statement to the police, Morrow acknowledged that he was a passenger in Darden's car when he shot several times at the Westermans' truck. He stated that they chased the Westermans after someone in the truck shook the Confederate flag at them and shouted a racial epithet.

At the time the incident occurred, both Morrow and Darden were seventeen (17) years of age. Tony Andrews and Marcus Merriweather, other passengers

-4-

in Darden's car during the incident, were also juveniles. Andrews was seventeen (17) years of age, and Merriweather was fifteen (15) years of age. All four were charged in juvenile court with the delinquent act of premeditated first degree murder, and upon a transfer hearing in that court, were transferred to the Robertson County Circuit Court to be tried as adults.

Subsequently, Darden, Morrow, Andrews and Merriweather were each indicted on one (1) count of civil rights intimidation, one (1) count of premeditated first degree murder, one (1) count of felony murder and one (1) count of attempted aggravated kidnapping. Andrews entered into a plea agreement with the state wherein he pled guilty to criminally negligent homicide and was placed on diversion for two (2) years. Merriweather was tried on the instant offenses in a joint trial with Morrow and Darden.

At trial, Andrews testified for the state. Andrews stated that on the afternoon of the incident, he and Darden were driving around Guthrie in Darden's light blue car. Merriweather and Morrow eventually joined them, and they went to a friend's house so that Darden could collect some money owed to him. While they were sitting in the car, they noticed a red pick-up with a Confederate flag on its toolbox driving by. Subsequently, they saw the pick-up truck parked at Janie's. Darden remarked that he wanted to fight the people in the truck and drove to a local hangout to inform others that he intended to fight the occupants of the truck. The group went back to Janie's, and the truck was still in the parking lot. The truck then began to pull out of the parking lot, and when the truck was beside Darden's car, Morrow rolled his window down and began pointing at the flag. Andrews testified that he then saw someone reach out of the truck's back window and shake the Confederate flag.

Darden's car then pulled out of Janie's parking lot and alongside a car containing Robert Bell, Ricky Williams and Michael Mimms. Octavius Burks and Marcus Darden were in another car behind Bell's. When the Westerman truck began to exit Janie's, Appellant Darden remarked, "there it goes." Bell and Burks began to follow the truck, and the Darden car turned around and followed as well. The Darden car was approximately four (4) cars behind the Westerman truck, and Morrow told Darden to "catch" Bell. At this point, Morrow informed the other occupants of the car that he was armed.

The Darden car caught up with Burks and Bell and eventually passed both cars, putting them directly behind the Westerman truck. Darden's car was traveling approximately 70 to 80 miles per hour, and the truck began to speed up in front of them. Darden began to speed up, and Andrews heard shots fired from the back seat on the driver's side, where Morrow was sitting. Andrews turned around and saw Morrow leaning out of the window firing his gun. Bell was following the Darden car approximately three (3) to four (4) car lengths behind.

Because Morrow's gun jammed, he began fumbling with the weapon. Morrow then told Darden to pass the Westerman truck, and as they started to pass the truck on the left side, Andrews heard another shot fired from the same direction. When the car pulled alongside the Westerman truck, Andrews heard another shot fired from the back passenger seat. After they passed the truck, Andrews noticed that the truck slowed down. Darden began to slow down and then stopped his vehicle in the middle of the road. The truck stopped behind them, and Morrow leaned out of his window, pointed his gun at the truck and exclaimed, "[I've] got them now." The truck veered off into a ditch, and Morrow continued to fire his gun. Eventually, the truck was able to maneuver through the

ditch, out of the parking lot and back onto the road proceeding in the opposite direction.

Morrow testified on his own behalf at trial. He stated that on the day of the incident, he was carrying a gun for protection because his life had been threatened. He testified that they followed the Westerman truck because all of the occupants in the car were "looking for a fight." Although he acknowledged that they wanted to fight because someone in the truck waved the Confederate flag, he insisted that he did not shoot at the truck because of the flag. Instead, he testified that as Darden began to pass the Westerman truck, Darden, Merriweather and Andrews started yelling, "shoot!" Because of the "pressure" from the others in the car, he started firing his gun into the air. He stated that he never told Darden to stop his car in the road and did not point his gun at the truck when the car was stopped. He further testified that he never intended to harm anyone during the incident.

Appellant Darden also testified for the defense at trial. He claimed that no one in the car discussed fighting with the occupants of the truck. He was offended when someone in the truck shook the flag, but had no intention of shooting anyone. He was chasing the truck to "mess" with its occupants and did not know that Morrow was armed. He denied that anyone in the car coerced Morrow into shooting his weapon. When he heard the gunshots, he assumed that the truck was merely "backfiring." He further denied stopping in the roadway or attempting to "box in" the Westermans' truck.

At the conclusion of the proof, the trial court found both Morrow and Darden guilty of one (1) count of civil rights intimidation, one (1) count of first degree murder in the perpetration of an attempted aggravated kidnapping and one (1) count of attempted aggravated kidnapping. Merriweather was acquitted

of all charges. Both Morrow and Darden were sentenced to life imprisonment for first degree murder. Morrow was sentenced as a Range I offender to consecutive terms of four (4) years for civil rights intimidation and five (5) years for attempted aggravated kidnapping. Darden received Range I sentences of three (3) years for civil rights intimidation and four (4) years for attempted aggravated kidnapping, to run concurrently with each other but consecutively to the life sentence for first degree murder. From their convictions and sentences, appellants now bring this appeal as of right.

## MOTION TO DISMISS - MORROW AND DARDEN

Both appellants maintain that the trial court erred in failing to dismiss Counts One, Three and Four of the indictment charging them with civil rights intimidation, felony murder and attempted aggravated kidnapping. Appellants claim that they were transferred on the charge of premeditated first degree murder only, and there was no determination made in the juvenile court whether appellants were subject to be tried as adults on the charges of civil rights intimidation, felony murder and attempted aggravated kidnapping. Appellants therefore argue that the circuit court lacked jurisdiction over the charges not properly transferred from juvenile court, and they were erroneously indicted on these charges as a result.

Tenn. Code Ann. § 37-1-134(a) provides for the transfer of a juvenile to criminal court "to be held according to law and to be dealt with as an adult in the criminal court" once a petition alleging delinquency has been filed. Effective July 1, 1994, Tenn. Code Ann. § 37-1-134(c) was amended to provide for the following:

(c) The transfer pursuant to subsection (a) terminates jurisdiction of the juvenile court with respect to any and all delinquent acts with which the child may then or thereafter be charged, and the child shall thereafter be dealt with as an adult as to all pending and subsequent criminal charges; provided, that if a child transferred pursuant to this section is acquitted in criminal court on the charge or charges resulting in such transfer, or if such charge or charges are dismissed in such court, this subsection shall not apply and the juvenile court shall retain jurisdiction over such child.

Although the juvenile courts retain original and exclusive jurisdiction over juvenile matters, *see* Tenn. Code Ann. § 37-1-103, a transfer pursuant to Tenn. Code Ann. § 37-1-134(a) vests jurisdiction in the criminal courts over the juvenile. Subsection (c) serves to divest the juvenile court of its jurisdiction over the child "with respect to any and all delinquent acts with which the child may then or thereafter be charged." Once the criminal court obtains jurisdiction over the child, the child is to be "dealt with as an adult as to all pending and subsequent criminal charges." Tenn. Code Ann. § 37-1-134(c).

In the case *sub judice*, the appellants, upon being duly transferred from juvenile court, were subject to indictment by the Grand Jury of Robertson County. The grand jurors found probable cause to believe that appellants committed not only the offense of premeditated first degree murder, but also the offenses of felony murder, attempted aggravated kidnapping and civil rights intimidation. We believe that appellants were properly "dealt with as [adults] as to all pending and subsequent criminal charges" within the meaning of Tenn. Code Ann. § 37-1-134(c).

Furthermore, Tenn. Code Ann. § 37-1-134(e) provides that "no child, either before or after reaching eighteen (18) years of age, shall be prosecuted for an offense previously committed unless the case has been transferred as provided in subsection (a)." Emphasis added. Generally, when construing a statute, every

word within the statute is presumed to "have meaning and purpose and should be given full effect." State v. Odom, 928 S.W.2d 18, 29-30 (Tenn. 1996) (quoting Marsh v. Henderson, 221 Tenn. 42, 424 S.W.2d 193, 196 (1968)). If the legislature had intended for the juvenile transfer hearing to be offense-specific, "offense" or "charge" should have been substituted for the word "case." Similarly, Tenn. Code Ann. § 37-1-134(a) provides for the transfer of the "child," not the "offense."

Certainly, this Court in no way aims to trivialize the importance of the probable cause determination within the juvenile transfer hearing context. The juvenile court must find that there are "reasonable grounds" to believe that the child committed the delinquent act in order to properly transfer the child to criminal court. Tenn. Code Ann. § 37-1-134(a)(4)(A). However, we do not agree with appellants' interpretation of the statute.

Moreover, even if this Court were to find that the offenses of felony murder, attempted aggravated kidnapping and civil rights intimidation were not properly transferred from juvenile court pursuant to Tenn. Code Ann. § 37-1-134, appellants would not necessarily be entitled to relief. "[T]he absence of a transfer order cannot be said to affect the court's subject matter jurisdiction, which, in a real sense, is concurrent with that of the juvenile court as to certain offenses committed by children falling within a specified age span." Sawyers v. State, 814 S.W.2d 725, 729 (Tenn. 1991); *see also* State v. Hale, 833 S.W.2d 65, 67 (Tenn. 1992). The failure to properly transfer a child from juvenile court is subject to a harmless error analysis, with this Court's primary inquiry being whether transfer from juvenile court would have been appropriate. Sawyers v. State, 814 S.W.2d at 729.

A child may be transferred from juvenile court pursuant to Tenn. Code Ann. § 37-1-134(a), if the juvenile court finds "reasonable grounds to believe that: (A) [t]he child committed the delinquent act as alleged; (B) [t]he child is not committable to an institution for the mentally retarded or mentally ill; and (C) [t]he interests of the community require that the child be put under legal restraint or discipline." Tenn. Code Ann. § 37-1-134(a)(4). In determining that transfer was appropriate, the juvenile court found that appellants were not committable to a mental institution and that it was in the best interest of the community that appellants be put under legal restraint. Although the juvenile court did not specifically find "reasonable grounds to believe" that appellants committed the offenses of felony murder, attempted aggravated kidnapping and civil rights intimidation, clearly there were reasonable grounds in that appellants were subsequently found guilty of these offenses beyond a reasonable doubt. As a result, we find that transfer would have been appropriate on these offenses, and any error in the transfer procedure is at worst harmless.

Additionally, this Court notes that the state dismissed the premeditated first degree murder count against Darden, and Morrow was acquitted of that offense. At first glance, this would appear to trigger the second clause of Tenn. Code Ann. § 37-1-134(c) which provides, "if a child transferred pursuant to this section is acquitted in criminal court on the charge or charges resulting in such transfer, or if such charge or charges are dismissed in such court, this subsection shall not apply and the juvenile court shall retain jurisdiction over such child." Because neither appellant was convicted of premeditated first degree murder, the delinquent act alleged in juvenile court, a strict reading of that clause could arguably require that the juvenile court assume jurisdiction over the appellants. However, as the state points out, a literal interpretation of the statute would also

require the juvenile court to retain jurisdiction in instances where the juvenile was acquitted of the charged offense, but convicted of a lesser included offense. We do not believe that the legislature intended such an absurd result.

This Court's primary duty in construing a statute is "to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995); *see also* State v. Davis, 940 S.W.2d 558, 561 (Tenn. 1997). Legislative intent should be gleaned from the "natural and ordinary meaning of the language used, without a forced or subtle construction that would limit or extend the meaning of the language." Carter v. State, 952 S.W.2d 417, 419 (Tenn. 1997). Furthermore, this Court should construe a statute so that its component parts are consistent and reasonable, and inconsistent parts should be harmonized, where possible. State v. Odom, 928 S.W.2d at 30.

Once a juvenile has been transferred out of juvenile court pursuant to Tenn. Code Ann. § 37-1-134(a), the criminal court has jurisdiction to indict and try that juvenile as an adult. The criminal court thereafter has jurisdiction over the child, unless the transfer proceedings are, in effect, reversed by reason of acquittal or dismissal of all the charges in the criminal court. Tenn. Code Ann. § 37-1-134(c). If the child is completely absolved of all criminal charges, and the transfer proceedings are rendered invalid as a result, the juvenile court then retains jurisdiction over the child. Id.

We think that the second clause in Tenn. Code Ann. § 37-1-134(c) applies only when the juvenile is fully exonerated on the charges brought against him or her in criminal court. We think this to be a more sensible interpretation of the phrase, "charge or charges resulting in such transfer." Principles of double jeopardy might be implicated if appellants were forced to endure a delinquency

-12-

hearing after having been found guilty of these crimes beyond a reasonable doubt. However, if the juvenile court were to retain jurisdiction over the appellants and a delinquency hearing were barred by double jeopardy, appellants would effectively receive no penalty for these very serious crimes. Indeed, such a result would contravene the principles and purposes of the penal laws of this state.

Accordingly, we conclude that appellants were properly indicted on Counts One, Three and Four, charging them with civil rights intimidation, felony murder and attempted aggravated kidnapping. This issue is without merit.

## CONSTITUTIONALITY OF TENN. CODE ANN. § 37-1-159
## MORROW AND DARDEN

Appellants also claim that Tenn. Code Ann. § 37-1-159(d) is unconstitutional in that it denies them the right to seek an acceptance hearing in criminal court because they were transferred out of juvenile court by a lawyer judge. Darden argues that the abolition of an acceptance hearing under Tenn. Code Ann. § 37-1-159(d) deprives him of due process of law. Morrow asserts that there is no rational basis for distinguishing between those juveniles transferred by lawyer and non-lawyer judges; therefore, the denial of an acceptance hearing for those juveniles transferred by lawyer judges is a deprivation of equal protection of the law.

Prior to April 15, 1994, all juveniles transferred from juvenile court had the right to seek an acceptance hearing in criminal court to determine whether the criminal court would accept jurisdiction over the child. Tenn. Code Ann. § 37-1-159 (1991). However, effective April 15, 1994, the Tennessee Legislature

abolished the right to seek an acceptance hearing for those juveniles transferred by a lawyer judge. Tenn. Code Ann. § 37-1-159(d) provides, in pertinent part, "[i]f and only if a nonlawyer judge presides at the transfer hearing in juvenile court, then the criminal court, upon motion of the child filed within ten (10) days of the juvenile court order, excluding nonjudicial days, shall hold a hearing as expeditiously as possible to determine whether it will accept jurisdiction over the child."

The right to a transfer hearing is "sufficiently fundamental to be considered a matter of due process, in the context of juvenile justice." Sawyers v. State, 814 S.W.2d at 729. The transfer hearing in juvenile court has been likened to a preliminary hearing with regard to the issue of probable cause. State v. Womack, 591 S.W.2d 437, 443 (Tenn. App. 1979). However, the acceptance hearing in criminal court was created by statute as a review of the juvenile court's decision to transfer a juvenile into criminal court. Colyer v. State, 577 S.W.2d 460, 463 n. 2 (Tenn. 1979). There is no constitutional right to such an acceptance hearing in criminal court. State v. Joshua McDaniel, C.C.A. No. 03C01-9605-CC-00178, McMinn County (Tenn. Crim. App. filed June 5, 1997, at Knoxville). Furthermore, other avenues of review exist for a juvenile to appeal the juvenile court's decision to transfer, including preserving the issue on appeal to this Court. State v. Griffin, 914 S.W.2d 564, 566 (Tenn. Crim. App. 1995). Darden was not denied due process of law by the abolition of an acceptance hearing under Tenn. Code Ann. § 37-1-159(d).

Morrow contends that Tenn. Code Ann. § 37-1-159(d) deprives him of equal protection of the laws under Article I, § 8 of the Tennessee Constitution. As no fundamental right or suspect classification is involved, this Court's inquiry is limited to a rational basis review. State v. Ray, 880 S.W.2d 700, 706 (Tenn.

Crim. App. 1993). Under this review, this Court must uphold the statute if the classification is rationally related to a legitimate governmental interest. Id.

Although the juvenile transfer hearing is considered "fundamental" in the context of juvenile justice, there is no right to an attorney juvenile judge at the transfer hearing. State v. Davis, 637 S.W.2d 471, 474 (Tenn. Crim. App. 1982); State v. Briley, 619 S.W.2d 149, 152 (Tenn. Crim. App. 1981). In abolishing the right to seek an acceptance hearing for juveniles transferred by a lawyer judge, the legislature saw fit to retain the added tier of review for those juveniles transferred by judges not formally trained in the law. *See* Tenn. Code Ann. § 37-1-159(d). Our Supreme Court has recognized the significance of lawyer versus non-lawyer judges within the context of deprivation of liberty. *See* City of White House v. Whitley, ___ S.W.2d ___ (Tenn. 1998); State *ex rel.* Anglin v. Mitchell, 596 S.W.2d 779, 791 (Tenn. 1980). Therefore, due to the significant issues involved in a juvenile transfer hearing, *see* Tenn. Code Ann. § 37-1-134(a), (d), we find the distinction between those transferred by a non-lawyer as opposed to a lawyer to be neither arbitrary nor capricious. *See* State v. Ray, 880 S.W.2d at 706. Tenn. Code Ann. § 37-1-159(d) does not violate Morrow's rights to equal protection of the law.

This issue has no merit.

### TENN. CODE ANN. § 22-1-102 - MORROW

In his next issue, appellant Morrow asserts that Tenn. Code Ann. § 22-1-102 violates the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 701, *et seq.* He argues that Tenn. Code Ann. § 22-1-102 excludes "[p]ersons of

unsound mind and habitual drunkards" from jury service. Because these individuals are considered "handicapped" within the meaning of the Rehabilitation Act and the ADA, he maintains that the state statute runs afoul of the federal statutes. As a result, he claims that he was indicted by a grand jury which was not composed of a representative cross-section of the community.

The ADA and the Rehabilitation Act prohibit an entity from discriminating against a qualified individual with a disability, or excluding that individual "from participation in or [being] denied the benefits of [its] services, programs, or activities." 42 U.S.C. § 12132; *see also* 29 U.S.C. § 794. However, because the Rehabilitation Act applies only to entities receiving "Federal financial assistance," it is inapplicable in this case. 29 U.S.C. § 794(a); *see* State *ex rel.* McCormick v. Burson, 894 S.W.2d 739, 747 (Tenn. App. 1994). Therefore, we will restrict our review to Morrow's claim under the ADA, which does apply to state governments. 42 U.S.C. § 12131(1)(A); McCormick v. Burson, 894 S.W.2d at 747.

Under the ADA, " no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). Thus, in order to prove that Tenn. Code Ann. § 22-1-102 contravenes the ADA, there must be a showing that "persons of unsound mind and habitual drunkards" are otherwise qualified to serve as jurors. In other words, appellant must demonstrate that,

notwithstanding their handicap, these individuals meet all of the requirements of jurors. *See* <u>Southeastern Community College v. Davis</u>, 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979) (holding that an "otherwise qualified individual" under the Rehabilitation Act is "one who is able to meet all of a program's requirements in spite of his handicap").

The grand jury serves an important function, as its members are called on to "examine[] and scrutinize[] evidence in support of [a] charge, and must then say from that whether there is probable cause to believe that the person in question committed the offense and should be formally accused thereof by an indictment or presentment and brought to trial." <u>State v. Hudson</u>, 487 S.W.2d 672, 674 (Tenn. Crim. App. 1972). Certainly, the state has a legitimate interest in assuring that those making determinations involving the fundamental interest of liberty possess a sound and sober mind. It is illogical to assume that "persons of unsound mind and habitual drunkards" are able to rationally analyze evidence to determine whether an indictment should be issued. We, therefore, conclude that "persons of unsound mind and habitual drunkards" are not properly "qualified" within the meaning of the ADA, and as a result, Tenn. Code Ann. § 22-1-102 does not violate the ADA.

Furthermore, this Court sincerely doubts that Morrow has standing to raise a claim under the ADA. The ADA establishes a <u>civil remedy</u> for those persons "alleging discrimination on the basis of [a] disability." 42 U.S.C. § 12133; *see also* 29 U.S.C. § 794a(a)(2) (establishing a remedy for "any person aggrieved" by reason of his or her disability). There is no showing that Morrow was discriminated against on the basis of a disability. Additionally, even if this Court were to find that Tenn. Code Ann. § 22-1-102 violates the ADA, this would not necessitate a reversal of Morrow's conviction or a dismissal of the indictment.

Morrow also claims that, due to the exclusion of habitual drunkards and persons of unsound mind from the grand jury, he was denied a jury representing a fair cross-section of the community in violation of his constitutional rights. A state is "free to prescribe relevant qualifications for [its] jurors and to provide reasonable exemptions so long as it may be fairly said that the jury lists or panels are representative of the community." Taylor v. Louisiana, 419 U.S. 522, 538, 95 S.Ct. 692, 701, 42 L.Ed.2d 690 (1975). The United States Supreme Court has held that, in order to establish a prima facie violation of the fair cross-section requirement, the appellant must demonstrate:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

Duren v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979); see also State v. Bell, 745 S.W.2d 858, 860-61 (Tenn. 1988).

Morrow has failed to prove any of the aforementioned factors. The bare allegation that he was denied a jury composed of a fair cross-section of the community as a result of the exclusion of persons of unsound minds and habitual drunkards from jury service is insufficient to establish a constitutional violation. As such, this argument must fail.

This issue is without merit.

## RECUSAL OF TRIAL JUDGE - DARDEN

In his next issue, Darden claims that the trial judge erred in failing to recuse himself after having *ex parte* communications with an Assistant District Attorney.

He asserts that such communication was improper and created an appearance of impropriety. Therefore, he maintains that the trial judge abused its discretion in failing to recuse himself.

Several months prior to trial Assistant Attorney General Dent Morriss learned that Darden and Marcus Merriweather, who had been released on bond, had felony charges pending against them in Kentucky. General Morriss traveled to Kentucky, verified that this information was correct and was informed that both Darden and Merriweather were scheduled to be transported to a juvenile facility in Eastern Kentucky. Out of concern that a lengthy extradition process would be necessary in order to secure Darden and Merriweather's presence in court, Morriss prepared an order revoking their bond. Counsel for both defendants were notified of the state's intentions.[2]

General Morriss brought the order to Judge Wedemeyer, who was presiding over another trial at the time. Morriss and Judge Wedemeyer engaged in a conversation lasting approximately thirty (30) seconds, whereby Morriss informed him of the situation and presented certified copies of the Kentucky charging instruments. Judge Wedemeyer signed the order revoking defendants' bond, on the condition that a full hearing on the issue would be held within four (4) days. Four days later, a bond hearing was held, and the trial court ordered that defendants' bond remain revoked.[3]

Subsequently, Darden and Merriweather filed a motion for recusal, claiming that Judge Wedemeyer's impartiality was tainted by the *ex parte*

---

[2] The testimony at the hearing somewhat conflicts in this respect. Counsel for the defendants testified that they were notified that the state was filing a "motion" or an "application" to revoke Darden and Merriweather's bond. However, it is clear from the testimony that counsel were informed that the state intended to revoke the defendants' bond.

[3] The trial court revoked bond on the basis that defendants' incarceration in Kentucky would be in direct violation of the conditions of bond requiring that they remain within 50 miles of Springfield, Tennessee.

communications with the Assistant District Attorney. At the conclusion of the hearing on the motion to recuse, the trial judge found that he could be impartial despite any *ex parte* communications with the state. The trial court stated:

> The issue on Monday that brought this all up, like I said, it was probably all of 30 seconds, pertains to bond. This Court, not on a daily basis but certainly on a weekly basis, hears bond matters on cases that are going to eventually go to trial before this Court. In the process of that the Court hears things both favorable and unfavorable to defendants on bond issues. Just numerous, numerous times the Court has heard on different defendants on why their bond should be reduced or modified from the Defense and from the State why the bond should remain at a high level from Sessions Court or why bond should be revoked, et cetera. The Court believes that [it] is able to go ahead and preside on those cases keeping in mind that this Court practiced law for 13 years and has been on the bench more than 5. I have to follow the law and not consider bond issues later during the trial unless they somehow work themselves into the evidence in an appropriate manner.
>
> . . . .
>
> I do not find that the recusal motion should be granted. I do not think that my impartiality, and I realize it's kind of difficult when you are ruling on your own impartiality, I believe that I will continue to be fair and impartial to the defendants in this case despite signing that order.

A motion to recuse is a matter that rests within the sound discretion of the trial court, which will not be overturned on appeal unless an abuse of discretion is evident from the record. State v. Hines, 919 S.W.2d 573, 578 (Tenn. 1995); State v. Smith, 906 S.W.2d 6, 11 (Tenn. Crim. App. 1995). A trial judge should recuse himself whenever he has any doubt as to his ability to preside impartially or whenever his "impartiality might reasonably be questioned." S.Ct. Rule 10, Canon 3(C)(1) (1995); State v. Hines, 919 S.W.2d at 578; State v. Boggs, 932 S.W.2d 467, 472 (Tenn. Crim. App. 1996); State v. Cash, 867 S.W.2d 741, 749 (Tenn. Crim. App. 1993). However, the issue for this Court to consider is whether the trial judge "committed an error which resulted in an unjust disposition of the case." State v. Hurley, 876 S.W.2d 57, 64 (Tenn. 1993).

The trial judge found that he could remain impartial notwithstanding his communication with the Assistant District Attorney. Certainly, the fact that the trial judge acquitted Merriweather of all charges is indicative of his impartiality. The trial judge assured the parties that he would disregard any irrelevant information during the defendants' trial, and there is nothing in the record to show otherwise. We find no abuse of discretion from the record.

This issue is without merit.

## SUFFICIENCY OF THE EVIDENCE - MORROW AND DARDEN

In their next issue, both appellants contend that the evidence was insufficient to support their convictions. In a bench trial, the verdict of a trial judge is entitled to the same weight on appeal as a jury verdict. State v. Hatchett, 560 S.W.2d 627, 630 (Tenn. 1978); *see also* State v. Horton, 880 S.W.2d 732, 734 (Tenn. Crim. App. 1994). A guilty verdict accredits the state's witnesses and all conflicts are resolved in favor of the state. State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). On appeal, the state is entitled to the strongest legitimate view of the evidence and all legitimate or reasonable inferences which may be drawn therefrom. Id.

This Court is not at liberty to reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Furthermore, this Court will not disturb a verdict of guilt due to the sufficiency of the evidence unless the defendant demonstrates that the facts contained in the record and the inferences which may be drawn therefrom are insufficient, as a matter of law, for a rational trier of fact to find the accused guilty beyond a reasonable doubt. State v. Brewer, 932 S.W.2d 1, 19 (Tenn. Crim. App. 1996). Accordingly, it is this Court's

duty to affirm the convictions if the evidence, viewed under these standards, was sufficient for any rational trier of fact to have found the essential elements of the offense beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 317, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994).

## A. Civil Rights Intimidation

Appellants claim that the evidence is insufficient to support their convictions for civil rights intimidation because there was no evidence presented at trial that the victims in this case, Michael and Hannah Westerman, were exercising a constitutional right at the time of the incident. Tenn. Code Ann. § 39-17-309(b)(2) (1991) provides:

> [a] person commits the offense of intimidating others from exercising civil rights who . . . [i]njures or threatens to injure or coerces another person with the intent to unlawfully intimidate another because that other exercised any right or privilege secured by the constitution or laws of the United States or the constitution or laws of the State of Tennessee.

Both Darden and Morrow testified at trial that they noticed the Westermans' truck because of the Confederate flag, and they wanted to fight with the occupants of the truck. After becoming angered by one of the truck's occupants shaking the Confederate flag at them, Darden, Morrow and their cohorts chased the truck at excessive speeds until Morrow was in position to fire his weapon at the truck, resulting in the death of Mr. Westerman. When Darden was asked whether he intended to catch the Westermans' truck and fight, he responded, "[i]t might have crossed my mind."

Taking the evidence in the light most favorable to the state, it is clear that Darden and Morrow intended to injure or threaten the Westermans because the Confederate flag was displayed on their truck. See Tenn. Code Ann. § 39-17-

309(b)(2) (1991). No matter how offensive a symbol the Confederate flag may be to some members of our society, it is well-established that displaying a flag is constitutionally protected "symbolic speech." *See* Spence v. Washington, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974); Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931). We, therefore, conclude that the evidence is sufficient for a rational trier of fact to find that appellants committed the offense of civil rights intimidation beyond a reasonable doubt.

This issue has no merit.

### B. Attempted Aggravated Kidnapping

Appellants also challenge the sufficiency of the evidence for their convictions of attempted aggravated kidnapping. Aggravated kidnapping is "false imprisonment . . . committed . . . [w]ith the intent to inflict serious bodily injury on or to terrorize the victim or another." Tenn. Code Ann. § 39-13-304(a)(3) (1991). False imprisonment is defined as "knowingly remov[ing] or confin[ing] another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. 39-13-302(a) (1991). A criminal attempt is committed when a person, "acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." Tenn. Code Ann. § 39-12-101(a)(2) (1991).

Hannah Westerman testified that after her husband was shot, the light blue car that had passed them came to a complete stop in the roadway in front of them, and another car stopped behind them. As a result of this, she was forced to drive the truck through a ditch, across an embankment and into a parking lot in an effort to flee the scene. However, when she tried to exit the parking lot, the cars had blocked her access to the paved driveway, so she drove through

another ditch to exit the parking lot. All the while, someone in the light blue car was leaning out of the window pointing a gun at the truck.

Furthermore, Andrews testified that Darden stopped his car in the middle of the roadway, and Morrow leaned out of the window, pointed his gun at the truck and exclaimed, "[I've] got them now."

Looking at this evidence in the light most favorable to the state, a rational trier of fact could conclude that appellants attempted to confine the Westermans so as to "interfere substantially" with their liberty and with the intent to inflict serious bodily injury on or to terrorize them. Tenn. Code Ann. §§ 39-13-302(a), 39-13-304(a)(3) (1991). The evidence is sufficient to sustain appellants' convictions for attempted aggravated kidnapping.

This issue is without merit.

### C. Felony Murder

Appellants also contend that the evidence is insufficient to sustain their convictions for felony murder. Appellant Darden claims that the evidence is insufficient to support the underlying felony of attempted aggravated kidnapping; therefore he can not be convicted of first degree murder in the perpetration of the attempted aggravated kidnapping. Morrow contends that the killing of Michael Westerman was collateral to the attempted aggravated kidnapping, and therefore can not be sustained under State v. Severs, 759 S.W.2d 935, 938 (Tenn. Crim. App. 1988).

Tenn. Code Ann. § 39-13-202(a)(2) (1991) provides, in pertinent part, "[f]irst degree murder is . . . [a] reckless killing of another committed in the perpetration of, or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping or aircraft piracy." In the case of State v. Severs, this Court held that "to sustain a conviction of first-degree felony murder,

the killing must have been in pursuance of, rather than collateral to, the unlawful act described by the statute." 759 S.W.2d at 938. However, there is no requirement that the murder occur as a proximate cause of the underlying felony. State v. Middlebrooks, 840 S.W.2d 317, 332 (Tenn. 1992). The statute merely requires that the murder occur during the "perpetration of, or attempt to perpetrate" the underlying felony. Tenn. Code Ann. § 39-13-202(a)(2); State v. Middlebrooks, 840 S.W.2d at 332.

In this case, the evidence is clear that the murder occurred during the attempted perpetration of an aggravated kidnapping. Darden and Morrow wanted to fight the occupants of the truck as a result of seeing the Confederate flag displayed on the truck. In an effort to catch the Westerman vehicle and stop it, they began chasing the Westermans. As they were passing the Westerman truck, Morrow began shooting his gun and killed Michael Westerman. The shooting occurred in the "pursuance of" and was not merely collateral to the attempted aggravated kidnapping.

Moreover, because the evidence was sufficient to support appellants' convictions for attempted aggravated kidnapping, Darden's argument also fails. The evidence was sufficient to support appellants' convictions for first degree murder in the perpetration of an attempted aggravated kidnapping.

This issue has no merit.

## SENTENCING - MORROW AND DARDEN

In their final issues, appellants contend that the trial court erred in imposing their sentences. Both appellants challenge the trial court's imposition of consecutive sentences. Further, Morrow argues that his sentences for attempted

aggravated kidnapping and civil rights intimidation are excessive, and the trial court erred in failing to grant probation.

## A. Sentencing Standard of Review

This Court's review of the sentence imposed by the trial court is *de novo* with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d). This presumption is conditioned upon an affirmative showing in the record that the trial judge considered the sentencing principles and all relevant facts and circumstances. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). If the trial court fails to comply with the statutory directives, there is no presumption of correctness and our review is *de novo*. State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997).

The burden is upon the appealing party to show that the sentence is improper. Tenn. Code Ann. § 40-35-401(d) Sentencing Commission Comments. In conducting our review, we are required, pursuant to Tenn. Code Ann. § 40-35-210, to consider the following factors in sentencing:

> (1) [t]he evidence, if any, received at the trial and the sentencing hearing;
>
> (2) [t]he presentence report;
>
> (3) [t]he principles of sentencing and arguments as to sentencing alternatives;
>
> (4) [t]he nature and characteristics of the criminal conduct involved;
>
> (5) [e]vidence and information offered by the parties on the enhancement and mitigating factors in §§ 40-35-113 and 40-35-114; and
>
> (6) [a]ny statement the defendant wishes to make in the defendant's own behalf about sentencing.

Because the trial court considered the principles and purposes of the 1989 Sentencing Act, we will review appellants' sentences *de novo* with a presumption of correctness.

**B. Excessive Sentences - Morrow**

Morrow claims that the trial court erred in imposing excessive sentences for his convictions for attempted aggravated kidnapping and civil rights intimidation. Specifically, he asserts that the trial court misapplied five enhancement factors to his convictions.

Under the 1989 Sentencing Act, the presumptive sentence for these offenses is the minimum within the applicable range if no mitigating or enhancement factors for sentencing are present. Tenn. Code Ann. § 40-35-210(c); State v. Fletcher, 805 S.W.2d 785, 788 (Tenn. Crim. App. 1991). However, if such factors do exist, a trial court should start at the minimum sentence, enhance the minimum sentence within the range for enhancement factors and then reduce the sentence within the range for the mitigating factors. Tenn. Code Ann. § 40-35-210(e). No particular weight for each factor is prescribed by the statute, as the weight given to each factor is left to the discretion of the trial court as long as its findings are supported by the record. State v. Santiago, 914 S.W.2d 116, 125 (Tenn. Crim. App. 1995); *see* Tenn. Code Ann. § 40-35-210 Sentencing Commission Comments.

In imposing Morrow's sentence for civil rights intimidation, the trial court found that the following enhancement factors applied:

(1) the offense involved more than one (1) victim, Tenn. Code Ann. § 40-35-114(3);

(2) the personal injuries inflicted upon the victim were particularly great, Tenn. Code Ann. § 40-35-114(6);

(3) the defendant possessed a firearm during the commission of the offense, Tenn. Code Ann. § 40-35-114(9); and

(4) the defendant had no hesitation about committing a crime where the risk to human life was high, Tenn. Code Ann. § 40-35-114(10).

The trial court also found as a mitigating factor that the defendant, because of his youth, lacked substantial judgment in committing the offense. Tenn. Code Ann. § 40-35-113(6). After weighing the enhancement and mitigating factors, the trial court sentenced Morrow to four (4) years, the maximum Range I sentence for a Class D felony.

With regard to Morrow's conviction for attempted aggravated kidnapping, the trial court found two enhancement factors to be applicable, namely: (1) the defendant had no hesitation about committing an offense when the risk to human life was high, Tenn. Code Ann. § 40-35-114(10); and (2) the crime was committed under circumstances under which the potential for bodily injury to a victim was great, Tenn. Code Ann. § 40-35-114(16). The trial court also found that Morrow lacked substantial judgment due to his youth and applied that as a mitigating factor. Tenn. Code Ann. § 40-35-113(6). The trial court then imposed a sentence of five (5) years for attempted aggravated kidnapping, a Class C felony.

**1.**

Morrow claims that the trial court erred in applying Tenn. Code Ann. § 40-35-114(3), that the offense involved more than one (1) victim, to his conviction for civil rights intimidation. He maintains that there is no proof in the record to show that he was aware that there was more than one (1) person in the truck during the incident. He further argues that Hannah Westerman is not a "victim" within the meaning of Tenn. Code Ann. § 40-35-114(3).

We find Morrow's claim to be totally without merit. First of all, the indictment lists both Michael and Hannah Westerman as victims of the civil rights intimidation charge. While Morrow is correct in his assertion that a person who has lost a loved one is not a "victim" under this enhancement factor, *see* State v. Raines, 882 S.W.2d 376, 384 (Tenn. Crim. App. 1994), such is not the case here. During a high speed car chase, Morrow fired his gun at the Westermans' truck, not only killing Michael Westerman, but also threatening serious bodily injury to Hannah Westerman. Certainly, she is a "victim" as contemplated by Tenn. Code Ann. § 40-35-114(3). *See* State v. Raines, 882 S.W.2d at 384 (holding that a "victim" is one who is "injured, killed, had property stolen, or had property destroyed by the perpetrator of the crime").

Furthermore, Tenn. Code Ann. § 40-35-114(3) does not require that the defendant must be aware of the number of persons he is victimizing in order for this enhancement factor to apply, nor does Morrow cite any authority that stands for such a proposition. The trial court properly applied Tenn. Code Ann. § 40-35-114(3) as an enhancement factor.

**2.**

Morrow next contends that the application of Tenn. Code Ann. § 40-35-114(6), that the offense involved particularly great personal injuries, was inappropriate. He claims that the particularly great personal injury sustained by Michael Westerman was "inherent in his death and his death cannot be separated from the felony murder count for which he has been sentenced and separately applied to the civil rights intimidation count."

While Morrow's argument would be correct if this enhancement factor were applied to a homicide conviction, his reasoning is erroneous with regard to the civil rights intimidation charge. Serious bodily injury is not an essential element

-29-

of the offense of civil rights intimidation. *See* Tenn. Code Ann. § 39-17-309 (b)(2). Because Michael Westerman died during the course of the offense, this demonstrates greater culpability for the offense. *See* State v. Nix, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995). The trial court, therefore, did not err in applying this enhancement factor.

**3.**

Morrow next insists that the trial court erred in applying Tenn. Code Ann. § 40-35-114(9), the use of a deadly weapon during the commission of the offense, as an enhancement factor for his convictions for attempted aggravated kidnapping and civil rights intimidation. He alleges that the use of a deadly weapon was the aggravating circumstance in the attempted aggravating kidnapping conviction and was thus an essential element of that offense. He further maintains that "the proof is not clear if the weapon played any part in the Civil Rights Intimidation conviction and thus is inapplicable to that count."

We must note that Morrow is incorrect in his assertion that the trial court applied this enhancement factor on the attempted aggravated kidnapping conviction. Our review of the record indicates that the trial court did not consider the use of a deadly weapon as an enhancement factor for this conviction. Nonetheless, we find that the trial court would have been justified in doing so. Morrow was indicted on attempted aggravated kidnapping with the intent to inflict serious bodily injury on or to terrorize the victims. *See* Tenn. Code Ann. §§ 39-13-302(a), 39-13-304(a)(3) (1991). The use of a deadly weapon is not an essential element of the offense for which he was convicted, and the trial court could properly have considered this as an enhancement factor.

Secondly, contrary to Morrow's assertion, the record is abundantly clear that the use of a deadly weapon was instrumental in injuring or threatening to

injure the Westermans during the commission of the civil rights intimidation offense. *See* Tenn. Code Ann. § 39-17-309(b)(2) (1991). The trial court properly applied this enhancement factor to Morrow's conviction for civil rights intimidation.

**4.**

Morrow also claims that the trial court erred in finding as an enhancement factor that he had no hesitation about committing a crime when the risk to human life was high for his conviction for attempted aggravated kidnapping. Tenn. Code Ann. § 40-35-114(10). He argues that this enhancement factor was applied solely because a deadly weapon was used in the commission of the offense, and because the use of a deadly weapon is an element of the offense, this was an inappropriate enhancement factor.

Once again, Morrow is incorrect in his argument that the use of a deadly weapon is an element of the attempted aggravated kidnapping conviction. In any event, the proof showed that other motorists were on the roadway during the high speed chase. Any of these motorists were subject to injury or death by Morrow's actions. *See* State v. Williamson, 919 S.W.2d 69, 83 (Tenn. Crim. App. 1995). The trial court properly applied this enhancement factor.

**5.**

Morrow also alleges that the trial court erred in finding as an enhancement factor for his attempted aggravated kidnapping conviction that the crime was committed under circumstances under which the potential for bodily injury to a victim was great. Tenn. Code Ann. § 40-35-114(16).

The evidence at trial showed that Darden drove his car at excessive speeds while Morrow fired a weapon at the Westermans in an effort to stop the truck and substantially interfere with Hannah Westerman's liberty. By his actions, Morrow could have shot Mrs. Westerman and injured or killed her. He could

have caused a serious car accident, resulting in injuries or death to Mrs. Westerman. We conclude that Morrow's actions "demonstrate a culpability distinct from and appreciably greater than that incident" to the attempted aggravated kidnapping. State v. Jones, 883 S.W.2d 597, 603 (Tenn. 1994). Therefore, the trial court did not err in applying factor (16) to enhance Morrow's sentence.

**6.**

We find no error with regard to the trial court's application of enhancement factors. Furthermore, the weight given to mitigating and enhancement factors is left to the discretion of the trial court as long as its findings are supported by the record. State v. Santiago, 914 S.W.2d at 125. Accordingly, we conclude that Morrow's sentences of five (5) years for attempted aggravated kidnapping and four (4) years for civil rights intimidation were appropriate.

This issue has no merit.

## C. Probation - Morrow

Morrow maintains that the trial court erred in failing to grant probation on his sentences for attempted aggravated kidnapping and civil rights intimidation. He claims that he is a proper candidate for probation due to his "insignificant" criminal history and there is no evidence in the record which would rebut his statutory presumption favoring alternative sentencing.

An especially mitigated or standard offender convicted of a Class C, D or E felony is presumed to be a favorable candidate for alternative sentencing in the absence of evidence to the contrary. Tenn. Code Ann. § 40-35-102(6). A trial court must presume that a defendant sentenced to eight years or less and who is not an offender for whom incarceration is a priority is subject to alternative sentencing. State v. Byrd, 861 S.W.2d 377, 379-80 (Tenn. Crim. App. 1993). It

is further presumed that a sentence other than incarceration would result in successful rehabilitation unless rebutted by sufficient evidence in the record. Id. at 380.

Under the 1989 Sentencing Act, sentences which involve confinement are to be based on the following considerations:

> (A) [c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) [c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) [m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1); State v. Boston, 938 S.W.2d 435, 438 (Tenn. Crim. App. 1996). A trial court may consider the enhancement and mitigating factors set forth in Tenn. Code Ann. §§ 40-35-113, 40-35-114 as they are relevant to the § 40-35-103(1) considerations. State v. Boston, 938 S.W.2d at 438; State v. Zeolia, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996). The trial court should also consider the defendant's potential for rehabilitation when determining whether an alternative sentence would be appropriate. State v. Zeolia, 928 S.W.2d at 461.

In determining whether to grant or deny probation, a trial court should consider the circumstances of the offense, the defendant's criminal record, the defendant's social history and present condition, the need for deterrence, and the best interest of the defendant and the public. State v. Boyd, 925 S.W.2d 237, 244 (Tenn. Crim. App. 1995); State v. Black, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995).

Probation may be denied based solely upon the circumstances surrounding the offense. State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim.

App. 1995). However, the circumstances of the offense as committed must be especially "violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree, and the nature of the offense must outweigh all factors favoring probation." State v. Hartley, 818 S.W.2d 370, 374-75 (Tenn. Crim. App. 1991) (quoting State v. Cleavor, 691 S.W.2d 541, 543 (Tenn. 1985)).

There is no mathematical equation to be utilized in determining sentencing alternatives. Not only should the sentence fit the offense, but it should fit the offender as well. Tenn. Code Ann. § 40-35-103(2); State v. Boggs, 932 S.W.2d 467, 476-77 (Tenn. Crim. App. 1996). "Indeed, individualized punishment is the essence of alternative sentencing." State v. Dowdy, 894 S.W.2d 301, 305 (Tenn. Crim. App. 1994). In summary, sentencing must be determined on a case-by-case basis, tailoring each sentence to that particular defendant based upon the facts of that case and the circumstances of that defendant. State v. Moss, 727 S.W.2d 229, 235 (Tenn. 1986).

The trial court determined that confinement was necessary to avoid depreciating the seriousness of the offenses committed and was particularly suited to provide an effective deterrence to others likely to commit similar offenses. As a result, the trial court denied probation on appellants' convictions for attempted aggravated kidnapping and civil rights intimidation.

We agree with the trial court that the circumstances of the offenses mandate incarceration in this case. After observing the Confederate flag on the Westermans' truck, the appellants decided to "fight" with the occupants of the truck. Therefore, they pursued the Westerman truck, traveling in excess of the speed limit, and Morrow began firing a weapon at the Westermans, endangering not only his intended victims, but also other motorists in the area. Darden then

-34-

passed the truck on the left, putting Morrow in the position to fire the fatal shot. Darden then brought his vehicle to a stop in front of the Westermans, and Morrow continued to shoot. As a result, Mrs. Westerman had to maneuver her vehicle off of the paved roadway in order to elude the gunfire. We hold that the circumstances of the offense are especially violent, horrifying, shocking, reprehensible and offensive to warrant the denial of probation in this case.

This issue has no merit.

### D. Consecutive Sentencing - Morrow and Darden

In their final issue, appellants assert that the trial court erred in imposing consecutive sentences. Consecutive sentencing is governed by Tenn. Code Ann. § 40-35-115. A trial court may order sentences to run consecutively if it finds that one or more of the statutory criteria exists by a preponderance of the evidence. Tenn. Code Ann. § 40-35-115(b); State v. Black, 924 S.W.2d at 917. Additionally, when a trial court imposes consecutive sentences on the basis that the defendant is a dangerous offender, the court must also find that an extended sentence is "necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995).

The trial court found that both appellants were dangerous offenders "whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). The trial court stated:

> Mr. Darden was the individual who decided that a fight was appropriate based on the truck and the flag. Mr. Darden basically recruited the other vehicle and its occupants to help with what was going to be a fight. . . So, the critical thing for the Court is, as far as Mr. Darden's involvement, what did he do at the time that he knew

it was potentially more than a fight?  That would have been at the time that Mr. Morrow pulled out his pistol and commenced fire and attempting to fire and repeatedly firing the weapon.  Obviously in retrospect, if Mr. Darden had simply stopped his vehicle realizing that the situation had gotten out of hand we wouldn't be here today, . . . But he didn't.  What he did was speed up.  When he learned of the weapon before it was fired he sped up and passed the other vehicle.  He then proceeded to drive 80 miles an hour parallel in the wrong lane to the truck to put Mr. Morrow in a position to shoot and after shots were fired Mr. Darden then proceed[ed] to pass the truck and stop. . .  Then after the truck pulled through the ditch into the parking lot Mr. Darden proceeded to drive his vehicle into that lot and a further attempt to block the occupants of the truck.  All the while his companion Mr. Morrow was continuing to fire, and or attempt to fire, the pistol.

The court also noted that Morrow had "repeated opportunities to refrain from the use of a firearm" but continued "recklessly with no hesitation and no indication of any regard for human life to repeatedly fire the weapon."

We agree with the trial court that both appellants are dangerous offenders within the meaning of Tenn. Code Ann. § 40-35-115(b)(4).  Furthermore, we find that the terms imposed by the trial court are reasonably related to the severity of the offenses and are necessary to protect the public from further criminal acts by the appellants.  State v. Wilkerson, 905 S.W.2d at 938.   Although the trial court did not make the findings required by Wilkerson, we find that these factors are present under our power of *de novo* review.  *See* State v. Samuel Paul Fields, C.C.A. No. 01C01-9512-CR-00414, Davidson County (Tenn. Crim. App. filed February 26, 1998, at Nashville); State v. Edward Thompson, C.C.A. No. 03C01-9503-CR-00060, Cocke County (Tenn. Crim. App. filed December 12, 1996, at Knoxville).  Consecutive sentencing was appropriate in this case.

This issue has no merit.

## **CONCLUSION**

-37-

Upon our review of the record, we find that appellants' issues are without

merit.  Accordingly, the judgment of the trial court is affirmed.


_____
JERRY L. SMITH, JUDGE


CONCUR:


_____
GARY R. WADE, PRESIDING JUDGE


_____
DAVID G. HAYES, JUDGE